**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| ONE LONGHORN LAND I, L.P., | : |
| | : |
| Plaintiff | : |
| | : |
| v. | : |
| | : |
| DAVID PRESLEY, PAUL ROSS and | : |
| ANTHONY STACY, | : |
| | : |
| Defendants. | : |

CIVIL ACTION NO. 4:15-CV-00203

JURY TRIAL DEMANDED

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff One Longhorn Land I, L.P. ("Plaintiff") brings this action against Defendants David Presley, Paul Ross, and Anthony Stacy (collectively, the "Defendants") to recover monetary damages, civil penalties, and all other available remedies for violations of the Securities Exchange Act of 1934 (the "Exchange Act"), the Texas Securities Act of 1933 (the "Texas Act"), and Texas common law.

## I.
## JURISDICTION AND VENUE

1.      To the extent this action asserts claims pursuant to the Exchange Act or the rules and regulations promulgated thereunder, this Court has: (a) exclusive jurisdiction over the subject matter of this action pursuant to 15 U.S.C. § 78aa(a) because this action is one at law brought to enforce any liability or duty created by the Exchange Act or the rules and regulations promulgated thereunder; and (b) original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

2.      To the extent this action also asserts claims pursuant to the laws of the State of Texas, this Court has supplemental jurisdiction over the subject matter of such claims pursuant to 28 U.S.C. § 1367(a) because such claims are so related to claims asserted pursuant to the Exchange Act or the rules and regulations promulgated thereunder that the claims asserted pursuant to the laws of the State of Texas form part of the same case or controversy.

3.      Venue is proper in this Court pursuant to 15 U.S.C. § 78aa(a) because at least one act or transaction constituting a violation of the Exchange Act or the rules and regulations promulgated thereunder occurred in the Eastern District of Texas insofar as: (a) Plaintiff is a resident of this District; and (b) Defendant Presley, Defendant Ross, and Defendant Stacy, in connection with the purchase or sale of securities, directly or indirectly (i) employed devices, schemes or artifices to defraud Plaintiff in this District, (ii) made untrue statements of material fact to Plaintiff in this District, or omitted to state to Plaintiff in this District material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in acts, practices or courses of business which operated as a fraud or deceit upon Plaintiff, a purchaser and seller of securities, in this District.

4.      Venue also is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in the Eastern District of Texas insofar as: (a) Plaintiff is a resident of this District; and (b) Defendant Presley, Defendant Ross, and Defendant Stacy, in connection with the purchase or sale of securities, directly or indirectly (i) employed devices, schemes or artifices to defraud Plaintiff in this District, (ii) made untrue statements of material fact to Plaintiff in this District, or omitted to state to Plaintiff in this District material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading,

and/or (iii) engaged in acts, practices or courses of business which operated as a fraud or deceit upon Plaintiff, a purchaser and seller of securities, in this District.

## II.
## PARTIES

5.      Plaintiff is a limited partnership that: (a) is organized pursuant to the laws of the State of Texas; and (b) maintains its principal place of business in, and thus is a resident of, Collin County, Texas.

6.      Defendant David Presley ("Defendant Presley") is an individual that is a resident of the State of Oklahoma.  Upon information and belief, Defendant Presley resides at 11428 South Sandusky Avenue, Tulsa, OK 74137.

7.      Defendant Paul Ross ("Defendant Ross") is an individual that is a resident of the State of Oklahoma.  Upon information and belief, Defendant Ross resides at 5219 East 105th Street, Tulsa, OK 74137.

8.      Defendant Anthony Stacy ("Defendant Stacy") is an individual that is a resident the State of Arizona.  Upon information and belief, Defendant Ross resides at 9233 East Canyon View Road, Scottsdale, AZ 85255.

## III.
## FACTUAL BACKGROUND

### A.      The Freedom Films Enterprise, and Its Controlling Members

9.      Defendant Presley is a 50% owner of Freedom Films, LLC ("Freedom Films"). The other 50% owner, and managing member, of Freedom Films is Defendant Presley's son, Brian Presley.

10.     Freedom Films is a Delaware limited liability company that owns and controls, as managing member, the following other entities: (a) Freedom Films Production, LLC; (b)

Freedom Films Development, LLC; (c) Freedom Films Independent, LLC; (d) five other limited liability companies believed to be production entities for specific films (collectively, the "Freedom Films Companies").  Each of the Freedom Films Companies are owned 100% by Freedom Films and, hence, are controlled by Defendant Presley (as 50% owner) and by his son Brian Presley (as 50% owner).

11.     On or about July 30, 2010, Freedom Films formed FF Arabian, LLC ("FF Arabian," and together with Freedom Films and the Freedom Films Companies, collectively, the "Freedom Films Enterprise").  FF Arabian is an owned and controlled subsidiary of Freedom Films.

12.     Freedom Films initially was a small minority interest owner of FF Arabian. In October 2011, around the same time that Plaintiff acquired its interest in FF Arabian, Freedom Films Independent, LLC purported to acquire a 21% ownership interest in FF Arabian.

13.     At all pertinent times, Defendant Presley and Brian Presley, in their dealings with Plaintiff and its representatives, acted on behalf of Freedom Films, the Freedom Films Companies, FF Arabian, and other affiliated entities that are owned and/or controlled by Freedom Films.

14.     The Freedom Films Enterprise and other affiliated entities that are owned and/or controlled by Freedom Films were established as a means of insulating Defendant Presley and Brian Presley from liability in connection with their conduct of an independent film finance, development, and production business.

15.     At all pertinent times, Defendant Presley served as an advisor with direct or indirect possession of the power to direct or cause the direction of the management and policies of the entire Freedom Films Enterprise, as well as FF Arabian.  Furthermore, Defendant Presley

personally and through his separate company, Frontier Energy Services LLC, of which Defendant Presley is the controlling shareholder, Chief Executive Officer, and President, oversaw and directed the financial affairs of the Freedom Films Enterprise.  Brian Presley, at all pertinent times, acted as the chief executive and manager of the Freedom Films Enterprise.

16.     Defendant Presley's personal attorney also assisted and advised Brian Presley with respect to the creation and maintenance of special purpose limited liability companies, such as FF Arabian.

17.     Brian Presley got his start in Hollywood as a soap opera star.  He then moved on to independent films where he made and distributed low budget films.  Defendant Presley was an avid fan of Brian Presley's work as an actor in Hollywood, and a fervent supporter of his efforts to produce and star in independent motion pictures.  Freedom Films was created to enable both father and son to work together in the film business.

18.     Defendant Presley and Brian Presley initially capitalized Freedom Films with a small sum of capital.  Its first film, entitled *Guarding Eddy*, was released in 2004.  It was a commercial failure, and was financed in part with loans from Defendant Presley.   Additional films were released in 2006, 2010, and 2011.  These too were financial failures.

19.     Though commercial success eluded them, Defendant Presley and Brian Presley sought to expand their slate of pictures and to increase the budgets by which they produced them.  Upon information and belief, Defendant Presley financed millions of dollars of Freedom Films Enterprise operating losses by way of capital advances that were: (a) made as loans to the Freedom Films Enterprise at Brian Presley's request; and (b) subject to Defendant Presley's ability to monitor, control, and direct the financial affairs of the Freedom Films Enterprise.

20.     Part of the Freedom Films Enterprise model was to spread risk and raise capital

from third party investors.  Brian Presley enlisted the aid of industry professionals to create a structure whereby the pre-sale of film rights to investors (like Plaintiff, here) would finance both development and production expenses of future films.  The Freedom Films Enterprise, under the direction and control of Defendant Presley and Brian Presley utilized limited liability membership interest as the vehicle to invest in their movie projects.

   **B.     Defendant Presley Meets Defendant Stacy and Defendant Ross, and Teams-Up With Palo Verde Fund**

   21.     Defendant Presley and Brian Presley ultimately were introduced to a private equity company called Palo Verde Fund L.P. ("Palo Verde").  Palo Verde is an Arizona limited partnership that is controlled by Defendant Stacy and Defendant Ross.  Defendant Stacy and Defendant Ross, in turn, are representatives of Paragon Capital Advisors, LLC, an investment advisor that is registered with the State of Arizona.

   22.     Defendant Presley and Brian Presley solicited Palo Verde to invest in one of Freedom Films's early pictures, believed to be entitled *Once Fallen*.  Although the film was a financial failure, Defendant Presley and Brian Presley nevertheless caused the Freedom Films Enterprise to pay Palo Verde a profit on its investment.

   23.     Shortly thereafter, and not surprisingly, Palo Verde invested in another motion picture, called *Touchback* that was produced by Brian Presley.  Notwithstanding that *Touchback* also proved to be a financial failure, Defendant Presley and Brian Presley sought to secure even more funding from Palo Verde.

   24.     Palo Verde and its representatives, Defendant Stacy and Defendant Ross, ultimately agreed to provide more funding (presumably from Palo Verde's investors) to the Freedom Film Enterprise; provided, however, that: (a) Palo Verde's interest in *Touchback*  was acquired by Brian Presley through the Freedom Film Enterprise; and (b) Palo Verde realized a

substantial profit on its investment in the film.

25.     Notwithstanding the financial failure of *Once Fallen* and *Touchback*, Defendant Presley and Brian Presley agreed to a course of action whereby, as a condition for additional funding from Palo Verde for other projects, they would provide a substantial profit on the investment made in *Touchback*.

**C.     FF Arabian is Created as an Investment Vehicle**

26.     The next project for which Defendant Presley and Brian Presley sought funding from Palo Verde was entitled *Arabian Nights*.

27.     In or around July 2010, Brian Presley, acting under the guidance and with the consent of Defendant Presley, established FF Arabian.  FF Arabian is governed by an operating agreement (the "Operating Agreement") that expressly: (a) defines *Arabian Nights* as the "Movie Project"; (b) prohibits financial transactions not related to FF Arabian or the *Arabian Nights* movie project; and (c) precludes any member from withdrawing capital from the company, or receiving any distribution or return of its capital contribution.

28.     Defendant Presley and Brian Presley formed FF Arabian with the specific expectation that Palo Verde would make further investments and finance the development and production of the *Arabian Nights* project.  In fact, the Operating Agreement specifically recited that a $5 million investment by Palo Verde was conditioned upon a Freedom Film entity redeeming Palo Verde's interest in *Touchback*.

29.     Upon information and belief, Brian Presley and Defendant Presley, and/or people acting under their direction and control, prepared, with the specific purpose of soliciting investments in the *Arabian Nights* film project by Palo Verde and its investors through FF Arabian, written materials that: (a) described the *Arabian Nights* film project; (b) provided

projections of the budgets and the potential returns on investment to potential investors; (c) detailed the investment that Palo Verde would make in the *Arabian Nights* film project; and (d) were provided to Palo Vere and circulated to its investors.

**D.    Defendant Subsidizes False Profits for Palo Verde**

30.    The solicitation of investments in *Arabian Night*s proved successful, and Palo Verde invested approximately $5.5 million in FF Arabian by way of transfers to Freedom Films Independent.   However, Defendant Presley and Brian Presley caused $3.5 million of this investment to be used to redeem Palo Verde's investment (plus a profit) in the *Touchback* movie project.   Of course, this misuse of funds violated the express terms of the Operating Agreement, which expressly prohibits financial transactions not related to FF Arabian or the *Arabian Nights* movie project.

31.    In other words, money that certain Palo Verde investors intended to be used towards the *Arabian Nights* movie project was diverted to redeem and pay a profit to other Palo Verde Fund investors on an unprofitable film.   This diversion of funds created the false impression that the *Touchback* film project was profitable.   In reality, however, this diversion of funds simply reflected a cycling of money from new investors to prior investors with the appearance of a legitimate business profit.   In other words, this was no more than a classic "Ponzi scheme."

32.    Upon information and belief, Defendant Stacy and Defendant Ross of Palo Verde knew of this "Ponzi" structure, and facilitated its use as a means of deceptively attracting new investors (like Plaintiff, here) to fund the Freedom Films Enterprise without regard to the prohibitions contained in the Operating Agreement.   And, upon information and belief, they did so with the full knowledge and approval of Defendant Presley and Brian Presley — each of

whom not only sought the additional funding, but also engaged in fund transfers from FF Arabian to other entities within the Freedom Film Enterprise.  This resulted in a failure to keep the proceeds of FF Arabian segregated from the proceeds and expenses associated with *Touchback* and other Freedom Films Enterprise expenses.

33.     Defendant Presley not only knew and approved of these improper transfers, but directed these transfers as well.   Because Defendant Presley was routinely and actively monitoring the consolidated financial statements of the Freedom Film Enterprise, and also was responsible for funding cash shortfalls that arose from time to time as a result of a funds transfer disguised as profits to Palo Verde, Defendant Presley directly or indirectly possessed the power to direct or cause the direction of the management and policies of FF Arabian.

**E.     Financial Pressures Mount for the Freedom Films Enterprise**

34.     Upon information and belief, Defendant Presley's financing of shortfalls for the Freedom Films Enterprise had grown to many millions of dollars. Therefore, efforts were made to minimize and reduce the shortfalls when FF Arabian was created.

35.     The infusion of new Palo Verde investor funds was made, in part, to address this growing capital deficit that Defendant Presley was funding.   Of the $5.5 million that was provided to FF Arabian by new Palo Verde investors, $3.5 million was paid to old Palo Verde investors in *Touchback*, and the remaining $2 million was transferred through other Freedom Films entities for various expenses that were wholly unrelated to FF Arabian — including nearly $1.8 million of transfers in September 2010 from Freedom Films Independent to Defendant Presley's company, Frontier Energy Services.   This looting of FF Arabian Capital violated the express terms of the Operating Agreement, which expressly prohibits financial transactions not related to FF Arabian or the *Arabian Nights* movie project.

36.     Upon information and belief, in the fall of 2010 the commercial failure of *Touchback* created extreme financial pressures on Defendant Presley, Brian Presley and the Freedom Films Enterprise.  Consequently, at the moment FF Arabian was funded it already was left with an unreasonably small capital of approximately $708,000, a mere fraction of its $8 million original capitalization.

**F.     Defendant Presley and Brian Presley Improperly Change the FF Arabian Project, and Palo Verde Investors Demand the Return of Their Capital**

37.     Notwithstanding tight capital constraints, Brian Presley proceeded to develop much more substantial motion pictures, one called *Thunder Run* and another called *Race to Save Nome*, with production budgets in excess of $50 million each.  Brian Presley advised Palo Verde that the *Arabian Nights* movie project was not viable, and urged that these two new projects be substituted as the FF Arabian movie project.  Of course, this required an amendment to the Operating Agreement which, in turn, would require the consent of a majority of all members of FF Arabian.

38.     Unsettled by Brian Presley's substitution idea, Defendant Ross and Defendant Stacy demanded the return of $4 million that was invested by Palo Verde's investors.  Upon information and belief, Defendant Presley and Brian Presley discussed Palo Verde's demand, and decided to return the capital but book it as a disguised "loan" rather than resist the demand. By doing so, Defendant Presley and Brian Presley conveniently avoided the need to obtain unanimous consent to amend the Operating Agreement and remove the prohibition against providing distributions to an existing member.

39.     In or around December 2010, Brian Presley and Palo Verde executed an Action by a Majority in Interest of Members (the "Majority Action") to amend the Operating Agreement.  By the Majority Action, the Operating Agreement was amended to: (a) replace

*Arabian Nights* with *Thunder Run* and *Race to Save Nome*; and (b) authorize the return of $4 million to Palo Verde for "prudent investments" to be made by Palo Verde.  Presumably, the Majority Action was intended to satisfy the express limitation on company investments being made only in "short term instruments or money market funds" pursuant to other provisions of the Operating Agreement.

40.     As a result of this return of capital to Palo Verde, FF Arabian's dire financial condition became substantially worse on both a balance-sheet basis as well as on an equitable-insolvency basis.  This deepened FF Arabian's reliance on further funding from the Freedom Films Enterprise, Brian Presley and, in turn, Defendant Presley.

41.     At all pertinent times, Defendant Presley: (a) directed Brian Presley to use (i) Defendant Presley's personal accountant to implement a reporting regimen for FF Arabian, and (ii) Defendant Presley's personal bank to facilitate financing with Freedom Films; and (b) reviewed financial reports regarding the performance of the Freedom Films Enterprises.  The reporting regimen was implemented to provide Defendant Presley's bank with information necessary to facilitate extensions of credit to Freedom Films — which Defendant Presley personally guaranteed and secured by pledging personal securities.

42.     Because of these financial investments, personal exposure, and paternal relationship with Brian Presley, Defendant Presley enjoyed and exerted dominant control over the affairs of the Freedom Films Enterprise and FF Arabian.

43.     In connection with the "prudent investments" ruse that was reflected in the Majority Action, Palo Verde provided, and Brian Presley executed, a written subscription for an investment in the limited partnership fund.  The subscription agreement, however, falsely claimed that FF Arabian was an "eligible investor," and further disclosed that "[t]he Partnership

is an investment that involves a high degree of risk and the undersigned can sustain a substantial loss of this investment in the partnership interest."

44.     Because FF Arabian no longer had sufficient capital, Brian Presley made various inter-entity transfers in order to gather enough money to return $4 million to Palo Verde.  Upon information and belief, these funds came from Defendant Presley and/or Frontier Energy Services, and were treated as additional loans to Freedom Films.  On December 20, 2010, Palo Verde received $3.5 million; on December 21, 2010, Palo Verde received the remaining $500,000.

### G.     Palo Verde Returns Only Part of the $4 Million

45.     As Brian Presley faced intensifying financial pressures caused by mounting film production commitments, and was unable or unwilling to ask his father to replace the missing capital, Palo Verde Fund began to return some capital between April 1, 2011 and August 15, 2011.  However, not all of the $4 million was returned.  To the contrary, only $1.75 million was wired back to FF Arabian.  As such, $2.25 million was never returned.

46.     As between Brian Presley and Defendant Stacy, there is a dispute as to whether this $2.25 million was supposed to be returned.  Upon information and belief, the $4 million initial capitalization was simply intended: (a) to "park" capital with FF Arabian; (b) to provide sufficient funds for the *Touchback* payments, which were required as a condition of the further investment with FF Arabian; and (c) to create a false impression of the profitability of *Touchback* for Palo Verde investors.

47.     Upon information and belief, after the $4 million was returned, Palo Verde, Defendant Stacy, and Defendant Ross confronted a host of problems with investors, including a lawsuit filed by multiple investors requesting that a receiver be appointed over Palo Verde and

two of its related entities: (a) Palo Verde Equity Fund, L.P.; and (b) PVPE, LLC, previously Paragon Capital Advisors, LLC, the general partner of the limited partnerships.

48.     In this environment of financial irregularities, Brian Presley, with the knowledge and consent of Defendant Presley, attempted to convince Palo Verde to repay more of the capital and made thinly veiled threats of litigation to recover the funds.  However, Brian Presley, again with the knowledge and consent of Defendant Presley, ultimately decided to work closely with Defendant Stacy and Defendant Ross in an effort to identify new sources of capital that might solve the capital shortfall, the deepening insolvency of FF Arabian, and the attendant risks that these issues posed for Defendant Presley, Defendant Stacy, Defendant Ross, Palo Verde, and Brian Presley.

**H.     Defendant Presley, Defendant Stacy, Defendant Ross, and Brian Presley Bring in New Investors — Including Plaintiff**

49.     In an effort to fill FF Arabian's capitalization gap, Defendant Stacy, Defendant Ross, and Palo Verde identified more potential investors, including Plaintiff.  Together with Defendant Presley and Brian Presley, they concocted a fiction to induce these new investors: they would assign their "right" to make capital contributions in FF Arabian to new investors. Little did Plaintiff or the other new investors know, however, they actually would be funding the shortfall created by the improper and ultra vires return of the $2.25 million that, pursuant to the disguised loan, would not be repaid by Palo Verde.

50.     In or around mid-2011, Defendant Stacy and Defendant Ross solicited a $500,000 investment in FF Arabian from Plaintiff.  In exchange, Defendant Stacy and Defendant Ross assigned Plaintiff their purported right to acquire a membership interest in FF Arabian — and Defendant Stacy and Defendant Ross did so with the knowledge and approval of David Presley and Brian Presley.

51.     In connection with the solicitation of Plaintiff, Defendant Stacy and Defendant Ross communicated with Rex Glendenning, a corporate representative of the general partner of Plaintiff, via face-to-face meetings, telephonic conferences, and email communications all directed to Mr. Glendenning in the Eastern District of Texas.

52.     After Mr. Glendenning expressed an interest in causing Plaintiff's general partner to cause Plaintiff to invest in FF Arabian, Defendant Stacy and Defendant Ross conveyed the substance of these communications to Brian Presley, who, in turn, enlisted the assistance of his attorney to provide information and data to Plaintiff's transactional counsel (and, in turn, to Plaintiff) via postal mail, email communications, and telephonic communications.

I.      **Defendant Stacy, Defendant Ross, and Brian Presley Fraudulently Induce Plaintiff's Investment by Omitting Material Information, Making Material Misrepresentations, and Breaching Funding Commitments**

53.     As part of his due diligence process, Plaintiff requested a complete set of corporate governance and authorization documents for FF Arabian.  Defendant Stacy, Defendant Ross, and Brian Presley provided Plaintiff with a set of governance and authorization documents for FF Arabian.  Unbeknownst to Plaintiff, however, that set was anything but complete.  Indeed, Brian Presley, acting in coordination with Defendant Stacy and Defendant Ross purposefully withheld the Majority Action dated December 10, 2010.  Needless to say, the Majority Action contains information that a reasonable investor (like Plaintiff, here) would have considered important in making a decision to invest in FF Arabian.

54.     Defendant Stacy, Defendant Ross, and Brian Presley also did not disclose to Plaintiff: (a) the capitalization irregularities reflected by Palo Verde's "parking" of $4 million in FF Arabian; (b) the fact that the $4 million was returned to Palo Verde; (c) the fact that Palo Verde repaid only $1.75 million; (d) that FF Arabian was insolvent; and (d) that FF Arabian was inadequately capitalized to achieve its stated objectives.  All of this is information that a

reasonable investor (like Plaintiff, here) would have considered important in making a decision to invest in FF Arabian.

55.     In order to induce Plaintiff to invest $500,000 in FF Arabian, Defendant Presley and Brian Presley committed Freedom Film Independent to acquiring a more substantial stake in FF Arabian, creating the appearance of confidence and bolstering its capital.   Of course, Defendant Presley and Brian Presley never intended to (or did) follow through with this commitment.

56.     Upon information and belief, Freedom Films's initial stake of 0.1% was customary to its finance investment structures in the past.   However, Brian Presley represented to Plaintiff in writings, and in a document entitled Second Amendment to the Operating Agreement, that Freedom Films Independent would invest $1.75 million into FF Arabian for a 21% stake in the company.   Defendant Presley knew of this representation and approved the additional investment with his own personal funds that would be paid into Freedom Films Independent and then into FF Arabian.

57.     Although at all pertinent times, FF Arabian maintained a separate bank account for its own capital, Brian Presley controlled the account and made transfers in order to satisfy other entities' obligations.   For example, Brian Presley used funds from FF Arabian's bank account to repay Defendant Presley's company, Frontier Energy Systems, $1.8 million.  Because Defendant Presley was paying all the shortfalls for the Freedom Films Enterprise, Brian Presley believed he was justified in using funds in FF Arabian accounts as he deemed necessary and without regard for the limitations in the Operating Agreement.   He did so with the knowledge and consent of Defendant Presley, who directly or indirectly possessed the power to direct or cause the direction of the management and policies of FF Arabian.

58.     Upon information and belief, Brian Presley did not cause Freedom Films Independent or any other entity controlled by Freedom Films to invest the full $1.75 million which he represented to Plaintiff would be invested in FF Arabian. Rather, upon information and belief, Brian Presley caused only $1 million of new money to be invested in FF Arabian by Defendant Presley.

59.     As to the remaining $750,000 investment that Freedom Films Independent made by and through Brian Presley directly, and Defendant Presley indirectly, Brian Presley caused Plaintiff's $500,000 to be repeatedly transferred from the Freedom Films Independent account to the FF Arabian account and back again. In other words, Defendant Presley and Brian Presley laundered the funds to make it appear that Freedom Films Independent had honored its capital contribution commitment when in fact it had not. Brian Presley did so without Plaintiff's knowledge or consent, and it created a false and deceptive paper trail regarding the investment of Freedom Films Independent's capital commitment. Defendant Presley, directly and through his representatives, was actively and consistently monitoring the financial affairs and transactions of the Freedom Films Enterprise, including Freedom Films Independent.

60.     At the same time Brian Presley was laundering Plaintiff's investment, and notwithstanding the chronic under-funding of FF Arabian, upon information and belief, Brian Presley continued to misuse and misappropriate FF Arabian's funds. For example, in December 2011, Brian Presley transferred $450,000 to an actor's escrow account at Creative Artists Agency to supposedly secure the acting services of actors for *Thunder Run*.

61.     This misuse of FF Arabian's assets was accomplished by way of a variety of fraudulent and inconsistent documents. Brian Presley, Defendant Stacy, and Defendant Ross choreographed the creation of numerous company records that reconfigured FF Arabian's assets

by, among other things, changing its film projects as well as the treatment of gross revenue.  As such, FF Arabian had two sets of first amendments to the Operating Agreement, and also had two sets of second amendments to the Operating Agreement, each of which reflected different rights and duties, but only one of which was provided to Plaintiff in the course of its due diligence.

62.    In the course of providing what Plaintiff reasonably expected to be complete information regarding FF Arabian, David Presley and Brian Presley failed to disclose that: (a) FF Arabian was experiencing severe financial pressure as a result paying *Touchback* investors; and (b) nearly $2.25 million, which FF Arabian was not seeking to recover, was distributed to Palo Verde Fund via a ruse of "prudent investment."  In communications by Palo Verde made on behalf of FF Arabian and Brian Presley, Palo Verde further represented that foreign rights to FF Arabian's films had been sold, and that capital had been generated from that sale.  In fact, no such sale had occurred.

63.    Brian Presley further induced Plaintiff's investment by causing the Operating Agreement to be amended so as to falsely assign Palo Verde's "right" to invest in FF Arabian. The amendment which authorized Plaintiff's investment represented and warranted that: (a) there had been no breach of the Operating Agreement; and (b) the "materials submitted or caused to be submitted" to Plaintiff in connection with this amendment and Plaintiff's entry as a member into FF Arabian were "true and correct in all material respects."   These representations and warranties were false and fraudulent in numerous respects.

64.    First, Palo Verde's investment had already been made by Palo Verde, and already had been distributed back to Palo Verde — which, of course, failed to honor its capital

contribution commitment.   Therefore, Palo Verde breached the Operating Agreement by demanding its capital and then failing to return it under the terms of the distribution.

65.    Second, Brian Presley had breached the operating agreement by: (a) redirecting proceeds from Palo Verde's new investors to pay-off Palo Verde's early investors in the unsuccessful film *Touchback*; and (b) using FF Arabian's capital for purposes other than the specified movie project.

66.    Third, as discussed above, FF Arabian had two sets of first amendments to the Operating Agreement, and also had two sets of second amendments to the Operating Agreement, each of which reflected different rights and duties, but only one of which was provided to Plaintiff in the course of its due diligence.

**J.     Defendant Stacy and Brian Presley Agree to Repurchase Plaintiff's Interest in FF Arabian, But Breach That Obligation**

67.    In mid-2012, Brian Presley and Defendant Stacy approached Plaintiff, and offered to have Freedom Films repurchase Plaintiff's interest in FF Arabian at a profit to Plaintiff. Plaintiff accepted this proposal.

68.    On or about October 1, 2012, Brian Presley caused Freedom Films to agree in writing (the "Purchase Agreement") to acquire all of Plaintiff's membership interest in FF Arabian for a purchase price $625,000.00.  Not surprisingly, Freedom Films has failed to make any payments to Plaintiff as required by the Purchase Agreement, and also has failed to repay any of Plaintiff's $500,000 investment in FF Arabian.

69.    Following Freedom Films's breach of the Purchase Agreement, Plaintiff, along with other investors in FF Arabian, including Palo Verde, commenced a civil action (the "State Court Action") against Freedom Films in Texas state court.  The State Court Action currently is pending in the District Court of Collin County under the caption *Palo Verde Fund, L.P., et al. v.*

*Freedom Films, LLC*, Civil Action No. 296-03664-2013, and asserts claims for breach of the Purchase Agreement.

### K.    Freedom Films and Brian Presley File for Bankruptcy and Spoliate Evidence

70.    On May 22, 2014, Freedom Films filed for bankruptcy protection in the Central District of California (Case No. 1:14-bk-12002).  As a result, the State Court Action has been stayed.

71.    On June 18, 2014, Brian Presley filed for bankruptcy protection in the United States Bankruptcy Court for the Central District of California (Case No. 1:14-bk-13029).  In connection with that bankruptcy case, Brian Presley has been named as a defendant in an adversary proceeding that asserts claims similar to those asserted in this action (Adv. Pro. No. 1:15-01016).

72.    During the course of these bankruptcy proceedings, Plaintiff also learned that the defendants have spoliated evidence necessary to prosecute many of the claims asserted in this complaint.  In connection with the bankruptcy case, Brian Presley has testified under oath that: (a) email communications from 2011, around the time that Plaintiff invested in FF Arabian, were lost due to technical malfunctions in the Freedom Films computer network; and (b) his personal computer, which he acknowledged using for Freedom Films business, had "crashed" and was corrupted and not readable.

73.    At the time Plaintiff filed the State Court Action, Plaintiff had not yet discovered that it was duped by the material misrepresentations, material omissions, and financial misconduct set forth in this Complaint.  Indeed, Plaintiff only learned of these facts during the course of the Freedom Films and Brian Presley bankruptcy proceedings.

**IV.**
**CAUSES OF ACTION**

**FIRST CLAIM FOR RELIEF**
**Violation of Section 10(b) of the Exchange Act**
**and Rule 10b-5 Promulgated Thereunder**
**Against All Defendants**

74.    Paragraphs 1 through 73 above are realleged and incorporated by reference as if fully set forth herein.

75.    Plaintiff's interest in FF Arabian is a security for purposes of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

76.    As a result of the activities described in Paragraphs 1 through 73 above, Defendant Presley, Defendant Ross, and Defendant Stacy, in connection with the purchase or sale of securities, and by the use of the means and instrumentalities of interstate commerce, each directly or indirectly: (a) employed devices, schemes or artifices to defraud Plaintiff; (b) made untrue statements of material fact to Plaintiff, a purchaser and seller of securities; (c) omitting to state to Plaintiff, a purchaser and seller of securities, material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (d) engaged in acts, practices or courses of business which operated as a fraud or deceit upon Plaintiff, a purchaser and seller of securities.

77.    Defendant Presley, Defendant Ross, and Defendant Stacy each knew, or were reckless in not knowing of the conduct described in Paragraphs 1 through 76 above.

78.    By reason of the foregoing, Defendant Presley, Defendant Ross, and Defendant Stacy each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

79.    Plaintiff suffered damages in reliance upon, and as a direct and proximate result of, the material misstatements and material omissions made by Defendant Presley, Defendant

Ross, and Defendant Stacy.  Indeed, Plaintiff would not have invested (and lost) $500,000 in FF

Arabian had Plaintiff been aware of the impaired financial condition of FF Arabian, the financial

improprieties at FF Arabian, and the unlawful insider dealings at FF Arabian.

80.     Defendant Presley, Defendant Ross, and Defendant Stacy each was a control

person of FF Arabian because each possessed, directly or indirectly, the power to direct or cause

the direction of the management and policies of FF Arabian.  Accordingly, pursuant to Section

20(a) of the Exchange Act, Defendant Presley, Defendant Ross, and Defendant Stacy each are

liable to the same extent as FF Arabian for violations of Section 10(b) of the Exchange Act and

Rule 10b-5 promulgated thereunder.

**SECOND CLAIM FOR RELIEF**
**Violation of Section 581-33 of the Texas Act**
**Against All Defendants**

81.     Paragraphs 1 through 80 above are realleged and incorporated by reference as if

fully set forth herein.

82.     Plaintiff's interest in FF Arabian is a security for purposes of Section 581-33 of

the Texas Act.

83.     Defendant Presley, Defendant Ross, and Defendant Stacy each offered and sold a

security to Plaintiff by means, directly or indirectly, of an: (a) untrue statement made to Plaintiff

of material facts; and/or (b) omission to state to Plaintiff material facts necessary in order to

make the statements made, in light of the circumstances under which they were made, not

misleading.

84.     By reason of the foregoing, Defendant Presley, Defendant Ross, and Defendant

Stacy each violated Section 581-33(A) of the Texas Act.

85.     Plaintiff suffered damages in reliance upon, and as a direct and proximate result

of, the material misstatements and material omissions made by Defendant Presley, Defendant Ross, and Defendant Stacy.  Indeed, Plaintiff would not have invested (and lost) $500,000 in FF Arabian had Plaintiff been aware of the impaired financial condition of FF Arabian, the financial improprieties at FF Arabian, and the unlawful insider dealings at FF Arabian.

86.     Defendant Presley, Defendant Ross, and Defendant Stacy each was a control person of FF Arabian because each possessed, directly or indirectly, the power to direct or cause the direction of the management and policies of FF Arabian.  Accordingly, pursuant to Section 581-33(F)(1) of the Texas Act, Defendant Presley, Defendant Ross, and Defendant Stacy each are jointly and severally liable to the same extent as FF Arabian for violations of Section 581-33(A) of the Texas Act.

**THIRD CLAIM FOR RELIEF**
**Aiding & Abetting Violation of Section 581-33 of the Texas Act**
**Against All Defendants**

87.     Paragraphs 1 through 86 above are realleged and incorporated by reference as if fully set forth herein.

88.     Plaintiff's interest in FF Arabian is a security for purposes of Section 581-33 of the Texas Act.

89.     FF Arabian offered and sold a security to Plaintiff by means, directly or indirectly, of an: (a) untrue statement made to Plaintiff of material facts; and/or (b) omission to state to Plaintiff material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

90.     By reason of the foregoing, FF Arabian violated Section 581-33(A) of the Texas Act.

91.     Plaintiff suffered damages in reliance upon, and as a direct and proximate result

of, the material misstatements and material omissions made by FF Arabian. Indeed, Plaintiff would not have invested (and lost) $500,000 in FF Arabian had Plaintiff been aware of the impaired financial condition of FF Arabian, the financial improprieties at FF Arabian, and the unlawful insider dealings at FF Arabian.

92.     Defendant Presley, Defendant Ross, and Defendant Stacy each directly or indirectly provided substantial assistance to FF Arabian: (a) in connection with its offering and sale of a security to Plaintiff by means of an (i) untrue statement made to Plaintiff of material facts, and/or (ii) omission to state to Plaintiff material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (b) with either (i) intent to deceive or defraud Plaintiff, and/or (ii) reckless disregard for the truth or the law. Accordingly, pursuant to Section 581-33(F)(2) of the Texas Act, Defendant Presley, Defendant Ross, and Defendant Stacy each are jointly and severally liable to the same extent as FF Arabian for violations of Section 581-33(A) of the Texas Act.

## FOURTH CLAIM FOR RELIEF
### Common-Law Fraud
### Against all Defendants

93.     Paragraphs 1 through 92 above are realleged and incorporated by reference as if fully set forth herein.

94.     Defendant Presley, Defendant Ross, and Defendant Stacy each directly or indirectly made representations to Plaintiff relating to FF Arabian.

95.     The representations directly or indirectly made to Plaintiff by Defendant Presley, Defendant Ross, and Defendant Stacy related to information that was material because: (a) such information was important to Plaintiff in making a decision to invest in FF Arabian; and/or (b) a reasonable person would have attached importance to, and be induced to act upon, such

information in determining whether to invest in FF Arabian.

96.     The representations directly or indirectly made to Plaintiff by Defendant Presley, Defendant Ross, and Defendant Stacy were false because they contained statements of present and/or past facts relating to FF Arabian that were untrue, deceptive, and/or misleading.

97.     At the time Defendant Presley, Defendant Ross, and Defendant Stacy each directly or indirectly made representations to Plaintiff relating to FF Arabian, Defendant Presley, Defendant Ross, and Defendant Stacy each: (a) knew, was aware, or understood that such representations were false; and/or (b) made such representations recklessly, as a positive assertion, and without knowledge of its truth.

98.     Defendant Presley, Defendant Ross, and Defendant Stacy each directly or indirectly made representations to Plaintiff relating to FF Arabian: (a) with the intent that Plaintiff would invest in FF Arabian based upon such representations; and/or (b) had reason to expect that Plaintiff would invest in FF Arabian based upon such representations.

99.     Plaintiff justifiably relied upon the representations that Defendant Presley, Defendant Ross, and Defendant Stacy each directly or indirectly made to Plaintiff relating to FF Arabian.  Indeed, Plaintiff invested (and lost) its investment and represented return in FF Arabian based upon the representations that Defendant Presley, Defendant Ross, and Defendant Stacy each directly or indirectly made to Plaintiff.

100.    Plaintiff suffered damages in reliance upon, and as a direct and proximate result of, the representations made by Defendant Presley, Defendant Ross, and Defendant Stacy. Indeed, Plaintiff would not have invested (and lost) its investment and represented return in FF Arabian had Plaintiff been aware of the impaired financial condition of FF Arabian, the financial improprieties at FF Arabian, and the unlawful insider dealings at FF Arabian.

**FIFTH CLAIM FOR RELIEF**
**Fraud By Nondisclosure**
**Against all Defendants**

101.    Paragraphs 1 through 100 above are realleged and incorporated by reference as if fully set forth herein.

102.    Defendant Presley, Defendant Ross, and Defendant Stacy each directly or indirectly concealed from or failed to disclose facts to Plaintiff relating to FF Arabian.

103.    Defendant Presley, Defendant Ross, and Defendant Stacy remained deliberately silent even though each had a duty to disclose the concealed or omitted facts to Plaintiff because: (a) there was a formal or informal fiduciary or confidential relationship between Plaintiff and Defendant Presley, Defendant Ross, and Defendant Stacy; (b) Defendant Presley, Defendant Ross, and Defendant Stacy discovered new information that made prior representations false or misleading; (c) Defendant Presley, Defendant Ross, and Defendant Stacy made prior representations that created a substantially false impression; and/or (d) Defendant Presley, Defendant Ross, and Defendant Stacy voluntarily disclosed some, but not all, material information to Plaintiff relating to FFA Arabian.

104.    The facts that Defendant Presley, Defendant Ross, and Defendant Stacy each directly or indirectly concealed from or failed to disclose to Plaintiff relating to FF Arabian were material because: (a) such facts were important to Plaintiff in making a decision to invest in FF Arabian; and/or (b) a reasonable person would have attached importance to, and be induced to act upon, such facts in determining whether to invest in FF Arabian.

105.    At the time Defendant Presley, Defendant Ross, and Defendant Stacy each directly or indirectly concealed from or failed to disclose facts to Plaintiff relating to FF Arabian, Defendant Presley, Defendant Ross, and Defendant Stacy each knew, was aware, or understood

that Plaintiff: (a) was ignorant of such facts; and/or (b) did not have an equal opportunity to discover such facts.

106.    By directly or indirectly concealing from or failing to disclose facts to Plaintiff relating to FF Arabian, Defendant Presley, Defendant Ross, and Defendant Stacy: (a) intended to induce Plaintiff to invest in FF Arabian; and/or (b) had reason to expect that Plaintiff would invest in FF Arabian based upon such representations.

107.    Plaintiff justifiably relied upon the nondisclosures by Defendant Presley, Defendant Ross, and Defendant Stacy.  Indeed, Plaintiff would not have invested (and lost) its investment and represented return in FF Arabian had Plaintiff been aware of the impaired financial condition of FF Arabian, the financial improprieties at FF Arabian, and the unlawful insider dealings at FF Arabian.

108.    Plaintiff suffered damages in reliance upon, and as a direct and proximate result of, the nondisclosures by Defendant Presley, Defendant Ross, and Defendant Stacy.  Indeed, Plaintiff would not have invested (and lost) its investment and represented return in FF Arabian had Plaintiff been aware of the impaired financial condition of FF Arabian, the financial improprieties at FF Arabian, and the unlawful insider dealings at FF Arabian.

## V.
## PRAYER FOR RELIEF

WHEREFORE, by reason of the foregoing, Plaintiff respectfully requests that this Court grant the following relief:

A.    entering a judgment against Defendant Presley, Defendant Ross, and Defendant Stacy, finding that they each: (1) violated Section 10(b) of the Exchange Act; (2) violated Rule 10b-5 promulgated thereunder; (3) violated Section 581-33 of the Texas Act; (4) committed common-law fraud; and (5) committed fraud by nondisclosure;

B.      granting Plaintiff recovery of all amounts paid by Plaintiff in connection with its investment in FF Arabian;

C.      granting an attachment against the assets of Defendant Presley, Defendant Ross, and Defendant Stacy to the extent of all amounts received by each such defendant in connection with Plaintiff's investment in FF Arabian;

D.      imposing a constructive trust on the assets of Defendant Presley, Defendant Ross, and Defendant Stacy to the extent of all amounts received by each such defendant in connection with Plaintiff's investment in FF Arabian;

E.      granting an injunction against further disposition of the assets of Defendant Presley, Defendant Ross, and Defendant Stacy to the extent of all amounts received by each such defendant in connection with Plaintiff's investment in FF Arabian;

F.      awarding Plaintiff damages in an amount to be determined at trial;

G.      awarding Plaintiff its attorneys' fees, costs, and other expenses incurred in this action;

H.      awarding Plaintiff pre- and post-judgment interest at the highest applicable rate; and

I.      granting such other and further relief as is just and proper.


Dated: March 23, 2015                 Respectfully Submitted,

/s/ Brian K. Norman

Brian K. Norman
State Bar No. 00797161

SHAMOUN & NORMAN LLP
1755 Wittington Place, Suite 200
Dallas, TX 75234
Telephone: (214) 987-1745
Facsimile: (214) 521-9033
Email: bkn@snlegal.com